# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-CA-01035-COA

| | |
|---|---|
| LAST WILL AND TESTAMENT OF RICHARD BAKER PRICHARD: AMY MARTIN, LISA BETHEA AND JANA PRICHARD BELL, AS EXECUTRIX OF THE ESTATE OF JAN PRICHARD, DECEASED | APPELLANTS |

v.

| | |
|---|---|
| MORGAN ARCENEAUX, MARKKA PRICHARD AND LANDON PRICHARD | APPELLEES |

DATE OF JUDGMENT:                  09/02/2022
TRIAL JUDGE:                       HON. C. MICHAEL MALSKI
COURT FROM WHICH APPEALED:         PRENTISS COUNTY CHANCERY COURT
ATTORNEYS FOR APPELLANTS:          MARK NOLAN HALBERT
                                   ANDREW WAYNE COFFMAN
ATTORNEY FOR APPELLEES:            JOHN A. FERRELL
NATURE OF THE CASE:                CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION:                       AFFIRMED IN PART; REVERSED AND
                                   RENDERED IN PART - 07/30/2024
MOTION FOR REHEARING FILED:

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1.     Richard Baker (R.B.) Prichard died testate in 2019. He was survived by three children—Jan Prichard, Lisa Bethea, and Amy Martin. His wife (Martha) and one child (Mark Prichard) predeceased him. This appeal involves (1) a certificate of deposit (CD) that R.B. and Amy jointly owned with rights of survivorship and (2) an investment account that designated R.B.'s surviving children as pay-on-death beneficiaries. Mark's three children—Morgan Arceneaux, Markka Prichard, and Landon Prichard—brought this action

alleging that they were collectively entitled to one quarter of the proceeds of the CD and investment account. After a bench trial, the chancellor found that Amy's ownership of the CD and R.B.'s designation of beneficiaries of his investment account were the product of undue influence. The chancellor imposed a constructive trust on the proceeds of the CD and the investment account and ordered the funds to be distributed according to the residuary clause of R.B.'s will. Jan's estate, Lisa, and Amy appealed.[1]

¶2. We affirm the chancellor's finding that Amy's ownership of the CD was the product of undue influence, as well as the chancellor's order that those funds should be distributed according to the residuary clause of R.B.'s will. However, we clarify that the residuary clause of R.B.'s will provides for a per capita distribution to the children of R.B. who survived him—and not to Mark's children. Our interpretation of the residuary clause of R.B.'s will moots any issue regarding the investment account because both provide for a per capita distribution to R.B.'s surviving children. Therefore, we do not address the issues that Amy raises related to the investment account.

## FACTS AND PROCEDURAL HISTORY

¶3. R.B. and Martha Prichard were married and had four children, Jan, Lisa, Mark, and Amy. Martha died in 2003, and for more than a decade thereafter, R.B. lived alone and made his own financial decisions. During that time, R.B. opened an investment account and two bank accounts. In 2004, R.B. opened an investment account with Lincoln Financial in which

---

[1] Jan died in 2020, and his estate was substituted as a party. The appellants here are Jan's estate, Lisa, and Amy. However, the allegations regarding undue influence involve Amy alone. Therefore, for ease of reference, we will refer to the appellants' arguments as Amy's arguments.

2

he designated Jan, Lisa, Mark, and Amy as primary beneficiaries "Equally Shared."[2]  In 2006, R.B. opened a Renasant Bank account ("Account 1219") that designated Amy alone as both the pay-on-death beneficiary and as an authorized signer on the account.  In June 2009, R.B. opened a Renasant checking account ("Account 7100") that designated Amy alone as a joint owner of the account with rights of survivorship.

¶4.     In April 2009, R.B. executed a will that named Amy as the executrix.  In that will, R.B. devised certain real property to Jan and certain real property to Mark.  Those specific devises each stated that if Jan or Mark predeceased R.B., then the respective properties would "be distributed to his [(i.e., Jan's/Marks's)] descendants, in equal shares, per stirpes." R.B. also bequeathed a Chevrolet Astro to Jan and a Buick Roadmaster to Mark.  R.B. left another property (known as "the Pizza Hut lot") to all four of his children "to share and share alike."  Finally, the residuary clause of R.B.'s will provided:

> I hereby devise and bequeath any property, whether it is real or personal, that I may own at the time of my death that is not specifically listed herein to my children, Jan Taylor Prichard, Mark Baker Prichard, Amy Lynn Prichard Martin, and Lisa Carroll Prichard Bethea to share and share alike.

R.B.'s will did not mention his financial accounts, all of which designated pay-on-death beneficiaries or another owner with rights of survivorship.

---

[2] R.B. did not designate any contingent beneficiaries, though the form he completed provided that option.  R.B.'s contract with Lincoln Financial provided: "Unless otherwise provided in the Beneficiary designations, if any Beneficiary dies before the Annuitant, that Beneficiary's interest will pass to any other Beneficiaries according to their respective interests."  After R.B. died, Lincoln Financial advised: "Unless a beneficiary designation specifically indicates that the beneficiaries are to be paid per stirpes, we will pay the proceeds for any predeceased beneficiary in equal shares to the remaining primary beneficiaries.  As you can see . . . , [R.B.'s designation] does not indicate that the funds should be paid per stirpes."

3

¶5.     In 2013, R.B. began to decline physically, and his doctor recommended that he no longer live alone.  R.B. moved into the Landmark, a facility that offered (1) independent-living apartments, (2) assisted living, and (3) a traditional nursing home.  R.B initially moved into an independent-living apartment, but in early 2014, he moved into the assisted-living portion of the facility.  There seems to be no dispute that R.B. was competent and capable of making his own financial decisions prior to his transition to assisted living in early 2014, but his mental acuity began to decline during 2014 and 2015.

¶6.     In late 2014 and early 2015, R.B. made two transactions that are the subjects of this appeal.  First, in November 2014, Amy drove R.B., at his request, to Renasant Bank, where he made Amy a joint owner with rights of survivorship of a CD ("7072").[3]  Previously, R.B. had been the sole owner of the CD.  At trial, Amy testified that R.B. told her that she should split the proceeds of the CD with her sister, Lisa, after he died.  Amy was the only witness who testified about the transaction.[4]

¶7.     Second, in March 2015, R.B. transferred all the funds from Renasant Account 7100 into a new investment account at Ameriprise Financial.[5]  Amy testified that she put R.B. in touch with her friend, Mark Stooksbury, a broker for Ameriprise in Tennessee.  Amy testified that she suggested that R.B. talk to Stooksbury because R.B. was not earning a good return

---

[3] When R.B. added Amy as a joint owner, the CD had a balance of approximately $155,077.13.  When R.B. died, the CD had a balance of approximately $158,329.71.

[4] Debbie Sartin, a Renasant Bank employee, assisted R.B. with the transaction, but Sartin did not testify at trial.

[5] The opening balance of the Ameriprise account was approximately $444,817.51.  When R.B. died, the account had a balance of approximately $471,675.12.

on Renasant Account 7100. R.B. talked to Stooksbury by telephone at least once. Stooksbury testified by deposition, and his deposition testimony was admitted into evidence. Stooksbury could not recall the details of his conversation with R.B., but he testified that he had no reason to believe R.B. was incompetent at the time of the transaction. Amy testified that she "went over every line [of the Ameriprise documents] with [R.B.] as he was reading them and explained them to him to make sure he understood everything."

¶8. When he opened his Ameriprise account, R.B. executed both an account agreement and a separate beneficiary designation form. On the beneficiary designation form, R.B. selected option "C," designating his "living lawful children" at the time of his death as the beneficiaries. The form explained that this meant that R.B.'s "living lawful children" at the time of his death would "receive equal shares of the proceeds; provided, however, that if a child of [R.B.] . . . died before [R.B.], the share which that child would have received . . . [would] be equally divided among the surviving children." R.B. selected option "C" *instead of* Option "D"—"Lawful Children With Rights of Survivorship per Stirpes." Option "D" provided that "if a child of the owner . . . died before the owner, the share which the child would have received if he or she survived the owner [would] be paid to [the] children of that deceased child, per stirpes."

¶9. At the time of the two transactions at issue in this appeal, R.B.'s four children were all living, and none were experiencing any significant health issues. But in November 2015, Mark suddenly and unexpectedly died. Mark was survived by his three children. In January 2019, R.B. died, survived by Jan, Lisa, and Amy.

¶10. In February 2019, R.B.'s will was admitted to probate, and Amy was appointed as the executrix of R.B.'s estate. In March 2019, Mark's three children filed a complaint to remove Amy as the executrix, for an inventory and accounting, and for other relief. In October 2019, they filed a new complaint, alleging, among other things, that Amy used undue influence to cause R.B. to (1) add her as a joint owner of Renasant CD 7072 and (2) designate only R.B.'s surviving children as beneficiaries of the Ameriprise account, which prevented Mark's children from receiving any of the proceeds when R.B. died. The complaint named Jan, Lisa, and Amy as defendants.

¶11. After trial, the chancellor found that a confidential relationship existed between Amy and R.B. at the time of the subject transactions, and a presumption therefore arose that the transactions were the product of undue influence. The chancellor also found that Amy failed to rebut the presumption of undue influence with respect to (1) R.B.'s designation of her as a joint owner of Renasant CD 7072 and (2) R.B.'s designation of the beneficiaries of his Ameriprise account. Based on those findings, the chancellor imposed a constructive trust on the proceeds of the CD and the Ameriprise account and ordered those funds to be distributed "according to the residuary clause of R.B.'s will"—rather than to Amy as the owner of the CD or to R.B.'s three surviving children as the designated beneficiaries of the Ameriprise account. Although the chancellor's opinion did not analyze the issue, the chancellor appears to have interpreted the residuary clause of R.B.'s will to provide for a per stirpes distribution under which Mark's children would collectively inherit one fourth of the residuary of R.B.'s

estate.[6]  Jan's estate, Lisa, and Amy appealed.[7]

¶12.    On appeal, Amy argues that the chancellor erred by finding that she failed to rebut the presumption of influence with respect to Renasant CD 7072.  Amy also argues that the chancellor erred by finding that a presumption of undue influence arose with respect to the Ameriprise account, by finding that she failed to rebut the presumption, and by imposing a constructive trust as a remedy.

¶13.    Following oral argument, this Court ordered supplemental briefing on the proper interpretation of the residuary clause of R.B.'s will.  Specifically, we noted that the language of the residuary clause differed markedly from the will's devises to Jan and Mark, which expressly provided for a "per stirpes" distribution to Jan's/Mark's "descendants" if Jan or Mark predeceased R.B.  *See supra* ¶4.  We asked the parties to address the significance of this language, and both sides filed supplemental briefs addressing this issue.

## ANALYSIS

¶14.    We will affirm the chancellor's factual findings if they are "supported by substantial evidence, unless the chancellor abused his discretion, clearly or manifestly erred, or applied the wrong legal standard."  *In re Est. of King v. King*, 303 So. 3d 423, 425 (¶9) (Miss. Ct.

---

[6] "The term 'per stirpes' denotes a method of distribution where a class of distributees take the share to which their deceased ancestor would have been entitled."  *Gartrell v. Gartrell*, 27 So. 3d 388, 390 n.1 (Miss. 2009).  Although the chancellor did not specifically state that the residuary clause provided for a per stirpes distribution, he did state that R.B.'s designation of beneficiaries for his Ameriprise account—which indisputably did *not* provide for a per stirpes distribution—"varied from . . . the residuary clause of [R.B.'s] will."

[7] The chancellor's opinion and final judgment ruled on claims regarding additional accounts and property.  However, this appeal relates solely to the proceeds of Renasant CD 7072 and the Ameriprise account.

App. 2020). We review issues of law, including "the interpretation or construction of a will," "de novo." *Miss. Baptist Found. v. Fitch*, 359 So. 3d 171, 174 (¶6) (Miss. 2023).

## I. The Renasant CD

¶15. Amy argues that the chancellor clearly erred by finding that she failed to rebut the presumption of undue influence as to the Renasant CD and also misapplied the test for rebutting the presumption.

### A. The chancellor did not clearly err by finding that Amy failed to rebut the presumption of undue influence.

¶16. In *Murray v. Laird*, 446 So. 2d 575 (Miss. 1984), our Supreme Court held that "when the circumstances give rise to a presumption of undue influence,"[8] "the burden of . . . proof shifts to the grantee/beneficiary to prove by clear and convincing evidence" each of the following: "(1) [g]ood faith on the part of the grantee/beneficiary; (2) [g]rantor's full knowledge and deliberation of his actions and their consequences; and (3) [a]dvice of (a) a competent person, (b) disconnected from the grantee and (c) devoted wholly to the grantor/testator's interest." *Id.* at 578.[9] Three years later, the Court modified *Murray*'s third

---

[8] Amy does not dispute the chancellor's finding that she had a confidential relationship with R.B., which gave rise to a presumption of undue influence. *Id.* at 578.

[9] Amy mistakenly argues that there are "three *ways* to rebut the presumption of undue influence." (Emphasis added). To the contrary, proof of *each* of the three elements is required to rebut the presumption. *Est. of Johnson v. Johnson*, 237 So. 3d 698, 711 (¶36) (Miss. 2017) ("The defending party must prove each of these by clear and convincing evidence to rebut the presumption."). Amy's appellate brief also fails to address the chancellor's finding that she did not satisfy the second essential element of the test. Amy waived this issue by failing to address it in full. *Lang v. Beasley*, 159 So. 3d 593, 596 (¶13) (Miss. Ct. App. 2014) ("Failure to completely brief this argument amounts to a waiver."). Notwithstanding Amy's waiver, we will address the issue.

element to eliminate any "uncompromising requirement of independent advice." *Mullins v. Ratcliff*, 515 So. 2d 1183, 1193 (Miss. 1987). The Court held that a grantee or beneficiary may satisfy the test's third element by "prov[ing] by clear and convincing evidence that the grantor/testator exhibited independent consent and action." *Id.* Under *Mullins*, "[i]ndependent advice is but one way independent consent and action may be shown." *Id.*

¶17. In the present case, the chancellor found that Amy failed to meet her burden as to all three elements and thus did not rebut the presumption of undue influence. In discussing the good faith element, the chancellor emphasized that Amy took R.B. to the bank alone to make her a joint owner of the CD and that the Renasant employee who assisted them was not called to testify at trial. Moreover, regarding the knowledge and deliberation element, the chancellor found that "the proof was insufficient to establish [R.B.'s] knowledge of his total assets and their general value" or "whether he grasped the effect of adding Amy as the survivor to this account." Substantial evidence supports the chancellor's findings regarding both elements. Therefore, the chancellor did not clearly err by finding that Amy failed to rebut the presumption of undue influence.

¶18. Finally, Amy argues that the chancellor misapplied the third prong of the *Murray*/*Mullins* test. Specifically, Amy argues that the chancellor erred by focusing on the absence of "independent advice" rather than considering more broadly whether Amy proved "independent consent and action." *See supra* ¶16.

¶19. But the chancellor did not misapply the law. The chancellor noted that the Supreme Court has stated that independent "advice is still clearly the *best* way to show . . .

9

'independent consent and action.'" *Madden v. Rhodes*, 626 So. 2d 608, 622 (Miss. 1993); *accord In re Est. of Hemphill*, 186 So. 3d 920, 939 (¶73) (Miss. Ct. App. 2016). In doing so, the chancellor correctly stated the *Murray/Mullins* test, and he specifically discussed the Supreme Court's holding that it requires proof of "independent consent and action," *not* "independent advice." The chancellor clearly and correctly stated the applicable law and its requirements. Accordingly, this issue is without merit.

¶20. In summary, the chancellor correctly applied the law, and substantial evidence supports his factual findings. Therefore, we affirm the chancellor's findings that Amy did not rebut the presumption of undue influence with respect to Renasant CD 7072. Because Amy was not a lawful joint owner of the CD, we also affirm the chancellor's ruling that the proceeds of the CD should be distributed according to the residuary clause of R.B.'s will. However, for the reasons explained below, our interpretation of the residuary clause differs from the chancellor's interpretation.

### B. The residuary clause provides for per capita distribution.

¶21. After oral argument, this Court ordered supplemental briefing on the meaning of the residuary clause of R.B.'s will because the chancellor's opinion was ambiguous on this point. The chancellor's opinion quoted the residuary clause, which states as follows:

> I hereby devise and bequeath any property, whether it is real or personal, that I own at the time of my death that is not specifically listed herein to my children, Jan Taylor Prichard, Mark Baker Prichard, Amy Lynn Prichard Martin, and Lisa Carroll Prichard Bethea to share and share alike.

After quoting the residuary clause, the chancellor added the following in a footnote:

> The following definition will assist in recognizing some of the issues in this

10

case:

> Per capita and per stirpes have definite meaning in law and are presumed to be used in their technical sense unless a contrary intention appears in the context of the will. "Per capita" means "by the head" or "share and share alike" according to the number of individuals. "Per stirpes" means "by the roots" or "stock" or by representation. It denotes the method of distribution where a class or group of individuals or distributees take the share which their "stock" (deceased ancestor) would have been able to take in a per capita distribution. "Equal division" as a general rule means a per capita and not a per stirpes gift under the will.

*Matter of Griffin's Will*, 411 So. 2d 766, 768 (Miss. 1982) (quoting William E. Morse, *Wills and Administration in Mississippi*, § 11:6 (1968)). Related to this subject, our anti-lapse statute preserves devises and bequests to a child who predeceases the testator. *See* Miss. Code Ann. § 91-5-7.

¶22. Thus, the residuary clause of R.B.'s will devises and bequeaths the residuary of his estate to his four children "to share and share alike," and the chancellor's footnote regarding the clause correctly observes that "share and share alike" is synonymous with "per capita." This could suggest that the chancellor interpreted R.B.'s residuary clause to provide for a per capita distribution. However, later in his opinion, the chancellor stated that R.B.'s designation of beneficiaries in his Ameriprise account—which provided for a per capita distribution to his children—"varied from" the distribution he provided for under "the residuary clause of his will." Moreover, the chancellor granted relief to Mark's three children by ordering funds to be distributed according to the residuary clause of R.B.'s will. Thus, it appears that the chancellor actually understood the residuary clause to provide for a per stirpes distribution.

¶23. In their supplemental brief, Mark's children argue that the chancellor correctly

11

interpreted the clause as providing for a per stirpes distribution. Mark's children argue (1) that the phrase "to share and share alike" does not address the question of *who* should inherit under the residuary clause and (2) that they are entitled to Mark's share pursuant to Mississippi's "anti-lapse statute." Miss. Code Ann. § 91-5-7 (Rev. 2021). In contrast, Amy argues (1) that the phrase "to share and share alike" demonstrates that R.B. intended a per capita distribution to his surviving children and (2) that the language of R.B.'s will—*not* the anti-lapse statute—is controlling.

¶24.    "It is elemental that when construing the will of a testator, the function of the chancellor, as well as that of this Court, is to determine and respect the intent of the testator." *Est. of Blount v. Papps*, 611 So. 2d 862, 866 (Miss. 1992). Indeed, "[o]ur polestar consideration, as always, is the intent of the testator, the right our law has given each competent adult to direct from the grave the disposition of his worldly goods." *Tinnin v. First United Bank of Miss.*, 502 So. 2d 659, 667 (Miss. 1987).

¶25.    But "in determining the testator's intent, in the absence of ambiguity, this Court is limited to the 'four corners' of the will itself." *Est. of Blount*, 611 So. 2d at 866. Within those four corners, we consider "the whole scheme of the testator manifested by the will, taking into consideration and *giving due weight to every word in the will*; and, when once the actual intent of the testator at the time of the making of the will has been in this way ascertained, all minor, subordinate, and technical rules of construction must yield." *Slaughter v. Gaines*, 220 Miss. 755, 762-63, 71 So. 2d 760, 763 (1954) (emphasis added).

¶26.    Although "minor" or "technical rules of construction" will not be invoked to override

12

the clearly expressed intent of a testator, we must also presume a will utilizes technical legal language in a way that is consistent with its understood legal meaning. Simply put, "[p]ersons are supposed to know the meaning of the terms they use unless there is something to show the contrary." *Proctor v. Lacy*, 160 N.E. 442, 444 (Mass. 1928). Thus, as our Supreme Court has stated, "[i]t is *Hornbook* law . . . that technical terms in a will must be given their technical meaning and the testator will be presumed, absent differing intent, to be cognizant of that existing legal meaning." *Posey v. Webb*, 528 So. 2d 833, 837 (Miss. 1988) (quoting *Tootle v. Tootle*, 490 N.E.2d 878, 881 (Ohio 1986)). In addition, "[i]f the terms of a will are plain and unambiguous, taking the whole instrument into consideration, the court will give them their legal significance." *Carlisle v. Carlisle's Estate*, 252 So. 2d 894, 895 (Miss. 1971) (quoting *Strickland v. Delta Invest. Co.*, 163 Miss. 772, 774, 137 So. 734, 736 (1931)).

¶27. Thus, we give effect to the language of an unambiguous will as the best evidence of the testator's intent. *Est. of Blount*, 611 So. 2d at 866. "A will is unambiguous if the terms of the will are plain, taking the whole instrument into consideration . . . ." *Neill v. Earls*, 343 So. 3d 1071, 1076 (¶10) (Miss. Ct. App. 2022) (brackets, ellipsis, and quotation marks omitted). "[A]n ambiguity arises only if the terms are susceptible to two *reasonable* interpretations.'" *Id.* at 1076 n.4 (brackets and quotation marks omitted). "If the language used in a devise only allows one interpretation as to how the testator's property is distributed, the will is unambiguous." *Id.* at (¶10) (brackets and quotation marks omitted).

¶28. The interpretive issue raised by R.B.'s residuary clause is whether it provides for a per

stirpes or per capita distribution. A leading treatise on the law of wills explains,

> [W]ith reference to the determination of the persons who shall take, a distribution per stirpes means that the principle of representation so applies that the heirs or representatives of one previously deceased, who would have taken if alive, will take by right of their ancestor. *A distribution per capita means that no representation applies, that the favored class is to be determined as it exists at the time prescribed by . . . the will, and that the heirs or representatives of one previously deceased cannot take, although such decedent would have taken in his own right, as a member of the favored class, had he survived.*

4 Bowe & Parker, *Page on the Law of Wills* § 36.6, at 665 (2004) (emphasis added).[10] Thus, whether Mark's children take under R.B.'s residuary clause depends on whether the residuary clause provides for a per stirpes or per capita distribution.

¶29. Under Mississippi law, the phrase "share and share alike" means that beneficiaries take per capita. *Griffin's Will*, 411 So. 2d at 768 ("Per capita and per stirpes have definite meaning in law and are presumed to be used in their technical sense unless a contrary intention appears in the context of the will. *'Per capita' means 'by the head' or 'share and share alike' according to the number of individuals.*" (emphasis added) (quoting W. Morse, *Wills and Administration in Mississippi* § 11:6 (1968))); *accord* 4 Bowe & Parker, *supra*, § 36.10, at 673 ("A direction to provide property . . . 'share and share alike' . . . imports a division per capita, in the absence of other provisions in the will tending to show a contrary intention."). Because these phrases have a "definite and fixed meaning in law," we must

---

[10] *See also Drafting Bequest Along Family Lines*, 28 Estate Planning 450, at *1 (WG&L Sept. 2001) ("As most practitioners are aware, 'per stirpes' means that a distribution should be made along family lines, with the descendants of a deceased child or other deceased beneficiary taking the deceased beneficiary's share. *On the other hand, 'per capita' means equally among the class of individuals named who are then living, without regard to the descendants of a deceased class member.*" (emphasis added)).

14

"presume[]" that R.B. used them in that sense in his will "unless a contrary intention appears in the context of the will." *Griffin's Will*, 411 So. 2d at 768.

¶30. No contrary intention appears in R.B.'s will. Indeed, the language and structure of the will as a whole provide further evidence that R.B.'s residuary clause calls for a per capita distribution. *McMurtray v. Deposit Guar. Bank & Tr. Co.*, 184 So. 2d 395, 398 (Miss. 1966) ("[T]he intention of the testatrix . . . must be drawn from the will as a whole."). In articles V(A) and V(B) of his will, R.B. *expressly* devised certain real property to Jan and to Mark "per stirpes." In those provisions, R.B. stated, "If Jan . . . does not survive me, said real and personal property located therein shall be distributed to his descendants, in equal share, per stirpes," and "[i]n the event Mark . . . does not survive me, said real property and personal property located therein shall be distributed to his descendants, in equal share, per stirpes." In contrast, R.B. used a different phrase in the very next provision of his will, article V(C), which devised the Pizza Hut lot to his four children "to share and share alike." R.B.'s use of these two different phrases—"per stirpes" and "share and share alike"—in close proximity indicates that he intended the phrases to mean different things. *Strickland*, 163 Miss. at 782, 137 So. at 736 ("Another principle of construction is that the use of different words in a will applying to the same subject-matter indicates that the testator had in view different results."); 4 Bowe & Parker, *supra*, § 30.21, at 178 ("If different words are employed with reference to a given subject matter, it will be assumed that testator intended a different meaning when he employed such different expressions."). If R.B. had intended article V(C) to provide for the same method of distribution as articles V(A) and (B), he would have repeated that same

15

language once more.

¶31.   The same is true for R.B.'s residuary clause.  If R.B. had intended his residuary to pass in the same manner as his devises to Jan and Mark—per stirpes—he could have used the same language in the residuary clause.  Instead, R.B. used a different phrase—"share and share alike"—that has a different legal meaning under Mississippi law.  In addition, we note that R.B. utilized the same per capita language ("share and share alike") in both instances in which he named all four of his children as beneficiaries—article V(C) and the residuary clause.  In contrast, he provided for a "per stirpes" distribution only in those instances in which he devised real property to a specific child.

¶32.   Based on the language used and the manner in which it was used within the four corners of this will, we are convinced that R.B. intended the phrase "share and share alike" to mean per capita.  To hold otherwise would give effect to technical language—per stirpes—in some devises but deny any effect to the phrase "share and share alike," treating it as mere surplusage.  Considering the language of the will as a whole, as well as applicable principles of will construction, we conclude that R.B. intended these different phrases to each carry their understood legal meanings.  Therefore, R.B.'s three surviving children—Jan, Lisa, and Amy—share equally under R.B.'s residuary clause.  In contrast, Mark's children "cannot take, although [Mark] would have taken in his own right, . . . had he survived."  4 Bowe & Parker, *supra*, § 36.6, at 665.

¶33.   Mark's children also argue that they should inherit under the residuary clause because the anti-lapse statute, Miss. Code Ann. § 91-5-7, overrides the language used by R.B. in his

16

will. The anti-lapse statute operates when property is devised or bequeathed to a child or descendant of the testator. *Id.* The statute generally provides that if such a beneficiary predeceases the testator and is survived by one or more children or descendants, then the devise or bequest to the beneficiary "shall not lapse" but shall pass to the beneficiary's children or descendants according to the laws of intestate succession. *Id.*[11]

¶34. However, we conclude that the anti-lapse statute should not override the language of R.B.'s will. The Mississippi Supreme Court has stated that "there is no Constitutional right more jealously safeguarded than the absolute freedom of a testator to dispose of his own property as he chooses. This is his business, and his business alone." *In re Est. of Vick*, 557 So. 2d 760, 765 (Miss. 1989).[12] Therefore, "the most solemn obligation any court can have [is] to see that the true intent of the testator is carried out." *Vick*, 557 So. 2d at 765. "[I]t is

---

[11] The statute provides in full:

> Whenever any estate of any kind shall or may be devised or bequeathed by the last will and testament of any testator or testatrix to any person being a child or descendant of such testator or testatrix, and such devisee or legatee shall, during the lifetime of such testator or testatrix, die testate or intestate, leaving a child or children, or one or more descendants of a child or children, who shall survive such testator or testatrix, in that case, such devise or legacy to such person so situated as above mentioned, and dying in the lifetime of the testator or testatrix, shall not lapse, but the estate so devised or bequeathed shall vest in such child or children, descendant or descendants, of such devisee or legatee in the same manner as if a legatee or devisee had survived the testator or testatrix and had died intestate.

Miss. Code Ann. § 91-5-7.

[12] *Accord In re Elton G. Beebe Sr. Irrevocable Fam. Mortg. Tr.*, 380 So. 3d 905, 917 (¶45) (Miss. 2024); *Est. of Bakarich v. Bakarich*, 337 So. 3d 1078, 1081 (¶12) (Miss. 2022); *In re Est. of Blackburn v. Richards*, 299 So. 3d 781, 787 (¶28) (Miss. 2020).

not the court's function to decide whether a will was in fact 'unfair' or 'unjust,' this being for the sole determination of the testator." *Id.* (citation omitted). Because we "jealously safeguard[]" the testator's "absolute [testamentary] freedom" and are bound to carry out his "true intent," *id.*, we conclude that the anti-lapse statute operates only as a default rule to be applied in the absence of language in the will demonstrating a contrary intent. *See Gibney v. Hossack*, 230 N.E.3d 1009, 1013-14 (Mass. 2024) (holding that Massachusetts's anti-lapse statute supplies a default rule—based on a judgment about what a typical testator probably intended—in the absence of contrary language in the will).

¶35.    In this case, as explained above, R.B. used markedly different language in different provisions of his will. R.B. demonstrated that he knew how to provide for a per stirpes distribution and devise property to his grandchildren if his own child predeceased him. He did so in clear terms in articles V(A) and V(B) of his will. Yet in his residuary clause, R.B. used materially different language that calls for a per capita distribution under which children of a deceased beneficiary do *not* take. R.B. had the "absolute freedom" to make such a choice in his will, and it is our "solemn obligation . . . to see that [R.B.'s] true intent . . . is carried out." *Vick*, 557 So. 2d at 765. Accordingly, under these circumstances, it would be inappropriate for a court to invoke a statutory default rule to override the meaning of the actual language of R.B.'s will, which clearly expressed his intent. Rather, the per capita distribution called for in R.B.'s residuary clause should be carried out.[13]

---

[13] Our holding in this case turns on the specific language of R.B.'s residuary clause and the clear contrast between that clause and the "per stirpes" language used elsewhere in the will. Of course, "[n]o two wills probably were ever written in precisely the same language throughout; nor any two testators died under the same circumstances in relation

18

## II.     The Ameriprise Account

¶36.    Amy next argues that the chancellor erred by applying a presumption of undue influence to R.B.'s selection of the beneficiaries of his Ameriprise account. But our interpretation of R.B.'s residuary clause moots any issue regarding the Ameriprise account and its beneficiary designation, and "[t]his Court will not adjudicate moot questions." *Barrett v. City of Gulfport*, 196 So. 3d 905, 911 (¶17) (Miss. 2016).

¶37.    The chancellor ordered the proceeds of the Ameriprise account to pass under the residuary clause, and Amy argues that the proceeds of the account should instead pass according to R.B.'s designation of beneficiaries for the account. But both the residuary clause and the Ameriprise account provide for per capita distribution to R.B.'s children who survived his death. Therefore, based on our interpretation of R.B.'s residuary clause, the proceeds of the Ameriprise account will pass to the same individuals and in the same amounts regardless of any further determination we make regarding the Ameriprise account or undue influence. Accordingly, we do not address the additional issues Amy raised on appeal.

## CONCLUSION

¶38.    The chancellor did not clearly err by finding that Amy's ownership of Renasant CD 7072 was the product of undue influence. Therefore, the chancellor did not err by imposing a constructive trust on the proceeds of the CD and ordering the proceeds to be distributed

---

to their estate, family, and friends. And it would be very unsafe, as well as unjust, to expound the will of one man by the construction which a court of justice had given to that of another, merely because similar words were used in particular parts of it." *Lusby v. Cobb*, 80 Miss. 715, 729, 32 So. 6, 8 (1902) (quoting *Bosley v. Wyatt*, 55 U.S. 390, 397 (1852)).

according to the residuary clause of R.B.'s will. However, contrary to the chancellor's apparent interpretation of the residuary clause, that clause provides for a per capita distribution to the children of R.B. who survived him—Jan, Lisa, and Amy. Finally, our interpretation of the residuary clause moots any issue regarding the Ameriprise account because R.B.'s designation of beneficiaries of that account called for the same distribution as the residuary clause of his will. Therefore, the proceeds of the Ameriprise account should also be distributed equally to Jan's estate, Lisa, and Amy.

¶39.    **AFFIRMED IN PART; REVERSED AND RENDERED IN PART.**

**BARNES, C.J., CARLTON, P.J., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**